IN THE UNITED STATES DISTRICT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| J.S. AND L.S, AS NEXT FRIENDS OF C.S., A MINOR; | § § § § | |
| *Plaintiffs,* | § § | |
| V. | § § | NO. 5:12-CV-01036 |
| AMERICAN INSTITUTE FOR FOREIGN STUDY, INC. D/B/A CAMP AMERICA | § § § | |
| *Defendant.* | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs J.S and L.S, as Next Friends of C.S., a minor, and complain of Defendant American Institute for Foreign Study, Inc., d/b/a Camp America, as follows:

### A.   PARTIES

1.   Plaintiffs J.S and L.S, as Next Friends of C.S., a minor, are a residents of Brazos County, Texas.[1]

2.   Defendant, American Institute for Foreign Study, Inc. d/b/a Camp America ("Camp America"), is incorporated under the laws of the State of Delaware.  Defendant has its corporate headquarters in Connecticut.  Defendant may be served with process by serving its registered

---

[1]   Plaintiffs has used initials in order to protect the minor's rights to privacy. *See* FED. R. CIV. P. 5.2(a)(3); *see Villanueva ex. rel. M.V. v. San Marcos Consol. I.S.D.*, 2006 WL 2591082, at n. 1 (W.D. Tex. 2006) ("Because M.V. is a minor, the Court, pursuant to this District's privacy policy, will use only the initials of M.V.").

agent for Texas, Prentice Hall Corporation System, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## B.   JURISDICTION

3.      This Court has jurisdiction under 28 U.S.C. § 1332(a) for the causes of action asserted against Defendant Camp America arises out of diversity jurisdiction. Based on its state of incorporation and the state of its nerve center, Defendant Camp America is a corporate citizen of the states of Delaware and Connecticut and therefore is completely diverse from the Plaintiff.

## C.   VENUE

4.      Venue is proper in this district because this civil action is brought where a substantial part of the events or omissions giving rise to the claim occurred in this district. See 28 U.S.C. § 1391(b).

## D.  BACKGROUND FACTS

5.      C.S. was 7 years old at the time he attended Camp Stewart for Boys (hereinafter "Camp Stewart") during the Summer of 2009.  He was assigned to a cabin led by a counselor named Scott Zirus (hereinafter "Zirus"). Zirus is an Australian national who is currently serving a 40-year sentence in the Texas Department of Corrections for the sexual assault after confessing to molesting two other boys at Camp Stewart. Zirus was sent to Camp Stewart through a Camp America, a for-profit program operated by the American Institute for Foreign Study.   Camp America is a corporation that specializes in finding foreign individuals who wish to work as camp counselors and matching them with camps in the United States that need counselors.

6.     In July 2008, Camp America and Camp Stewart entered into a written contract in which Camp America agreed to supply counselor candidates and provide their transportation to Camp Stewart.

7.     Camp America relies on a network of unsupervised independent contractors to conduct screening of counselor candidates. In Australia, the contractors sit in on three interviews, are provided a handbook and paid $60 AU per interview to conduct the screening. The Interviewer Handbook describes the role of these independent contractors as ". . . pre-selectors, assessors, publicity agents, information-givers, experience providers and spokespeople – they play an integral part in the whole application process." Interviewer Handbook page 40.  The Handbook goes on to note that ". . . the most important aspect of being an interviewer is choosing the right people! Pre-selection is essential. Our reputation is based on our ability to provide camps with appropriate, quality staff and that selection rests with you. The Camp America application procedure is set-up to aid the interviewer in pre-selecting effectively and efficiently. You are often the only Camp America representative who meets face-to-face with an applicant prior to their participation on our programme." Interviewer Handbook page 41.

8.     The Interviewer Handbook specifically warns its independent contractors that child abusers would be attracted to their program because of the access it would give them to potential victims. It tells interviewers that their role ". . . is to be the first line of defence in detecting unsuitable candidates who may potentially have problems being in close contact with children." Interviewer Handbook page 21. The Handbook goes on to describe specific issues that interviewers should examine to help weed out potential pedophiles from access to the program.

---

9.      Applicants to the Camp America program are required to provide two references. But, Camp America allows the applicants to upload the references themselves rather than requiring confidential references which would provide an opportunity for more candid and revealing information to be gathered. The independent contractors are instructed to coach the candidates about whole they should get references from and what they should say to improve their chances of being hired by a camp. The Handbook stresses the import role references play in the program stating "**We can't reiterate enough** that unsuitable references are the main cause of applications being kept on hold! . . . Camp America is very strict on reference requirements. References failing to meet all of our requirements will not be accepted." Interviewer Handbook page 26.

10.      The Handbook describes the requirements that all references must meet. In part, the requirements include that the references be "signed and dated" and that they must be done by someone "who has known the applicant in a professional capacity for a minimum of six months and states this on the reference." Interviewer Handbook page 27.

11.      While the Handbook reflects the importance of the references, it only requires its independent contractors to actually verify only 3 references over the course of the hiring season.

12.      Camp America relied on Mark McNaughton to interview Zirus. He was a long-time independent contractor for Camp America and worked in Perth in the Australian state of Western Australia without direct supervision by full-time Camp America employees. Mr. McNaughton said that he spent about an hour and a half interviewing Zirus but did not make any attempt to check his references since they had not been provided prior to the interview. Of the

Camp America policy requiring independent contractors to check references, Mr. McNaughton testified that he had not followed the policy for many years and that no one from Camp America required independent contractors to check any references.

Q:     And has that – when you say – what time frame are we talking about when you did that?

A:     I would say the last time that I actively personally checked a reference would have been 2003/2004.

Q:     So prior to that, were you, as part of your interview work, actually checking references for people, for applicants that you were processing?

A:     Again, it was not – it was not an expectation of the interviewer in their role to go back and check references. The responsibility of the interviewer is to check presentation.

13.     A review of the two references that Zirus provided to Camp America demonstrates that they did not meet Camp America's requirements. One of the references was unsigned. Neither reference was from someone who knew Zirus in a professional capacity. Mr. McNaughton said he knew of no one from Camp America that checked to verify either of Zirus' references.

14.     Mr. McNaughton also said that no one called to verify any of the employment claims or other details that Zirus included in his application. Instead, Mr. McNaughton took the information Zirus gave him about his credentials, exaggerated some of it and packaged it to be more entertaining to potential employers.

Q:     The next sentence you write: "One might raise an eyebrow at any man who felt compelled to leave home at the tender age of 14." Why would you raise an eyebrow at that?

A:     That turn of phrase is certainly me trying to engage the reader. I'm sure you can appreciate that I am a somewhat articulate person who enjoys writing, and I do think about who is going to be reading what I write and therefore I make an effort to make it an engaging rather than just another report. So my choice to use those – my decision to use those words would have been created to try and engage the reader.

15.     Mr. McNaughton later became Facebook friends with Zirus and went rock climbing with him. He did not, however, make any effort to investigate Zirus' writings on line. For several years, Zirus had written about a new religion he created called Shadoran. Among those writings were postings about the new sexuality that the Shadoran religion acknowledged which allowed sex between ". . . ANY age, race or gender." Dennis Reagan, an Camp America vice president, read these materials after Zirus was arrested and said that they alone would have been enough to keep him out of the program. He said:

A:     When I heard that there was online activity, I looked and had my staff look. And yes, we did find some – the word "shadow" comes to mind, and some very disturbing language attached to that particular moniker, if you will. And I looked at it thoroughly. I don't think I made copies, I just read it all.

Q:      And what was it about that that you found disturbing – to be disturbing language?

A:      It just – it just talked about boundaries or lack thereof. And in the context of the allegations, it was disturbing.

Q:      What type of boundaries? He – he was prolific?

A:      Yeah. And the – the gist of it were that in this fantasyland, there were no boundaries.

Q:      Would that kind of information have been something that you think would have deselected Mr. Zirus as an applicant had it been known?

A:      I certainly hope so.

16.      Bob Ditter, a frequent writer and lecturer in the camping industry, said that by failing to check Zirus' references, failing to verify his employment and volunteer work claims and failing to check his presence on the internet, Camp America violated the industry's safety standards.

Q:      So in this case, when the references for Mr. Zirus were not checked, did Camp America meet the standard that you think applies to them?

A:      No. They should have checked the references.

Q:      Is the standard for Camp America, in your opinion, that candidates like Mr. Zirus' employment claims should be verified?

A:      Yes.

Q:      Was that standard followed in this case?

---

A:     No.

Q:     Are those safe practices?

A:     They're not – safe practices?

Q:     Right.

A:     I would have to say, no.

Q:     Why not?

A:     Because there is no way of – well, let's be specific. Checking the references or not checking the references means that the authenticity of the references could not be verified.

Q:     Is it safer, when evaluating the suitability of a candidate, to verify their employment claims or not verify their employment claims?

A:     To verify.

Q:     Is it safer, when assessing the suitability of a candidate, to check their references or not check their references?

A:     To check.

Q:     If the choice is made not to check references, is that a safe choice?

A:     It's a less safe choice.

17.     Camp America also failed to administer tests to applicants that could help predict the threat that they might sexually abuse children. Dr. Gene G. Abel, with the Behavioral Medicine Institute of Atlanta, has developed a test to identify candidates who should not be working with children. For several years before Zirus applied to Camp America, Dr. Abel has

---

been offering the test in Australia and several other countries including the United States. The test taker answers questions on line and the results are reviewed and produced in less than 30 minutes. Dr. Abel's test has been used for almost a decade by churches and other youth-related organizations to prevent pedophiles gaining access to children.

18.    Had anyone checked, they would have found Zirus' past was littered with warnings signs about the threat he posed. Under questioning by Kerrville Sheriff's investigators after his arrest, Zirus admitted being sexually attracted to young boys from an early age. He told investigators that he was forced to leave home around age 14 because his mother abused drugs. From there, he described living in foster homes, abusing alcohol and struggling with his sexual attraction to young boys. Zirus told investigators that he sought out medical treatment when he was 20 years old to help curb his sexual interest in young boys. Zirus told investigators that he was living below the poverty line, surviving on government assistance checks and living in a tent or with acquaintances with no permanent address.

19.    These facts were in line with the Camp America Interviewer Handbook sections which warned their independent contractors about specific red flags associated with potential pedophiles. They included warnings about an applicant's history of frequent address changes, history of the applicant's own physical or sexual abuse and the inability to maintain adult relationships or steady employment. Zirus' Camp America application contained numerous clues about these issues but there is no evidence anyone made an effort to inquire into them.

20.    Zirus was suspected of abusing at least 7 boys while working at Camp Stewart. He was arrested after two of the boys made an outcry to their parents after the camp session

---

ended. He quickly confessed to molesting the two boys, pled guilty to three separate charges and is serving a 40-year sentence. A search of his belongings revealed Zirus had child pornography on his computer and photographs of nude boys on his digital camera. The evidence was turned over to authorities in Australia where a more than 10 additional charges of sexual abuse are now pending against Zirus.

### E.  CAUSE OF ACTION AGAINST CAMP AMERICA

21.    Defendant Camp America was negligent and breached its duty to use reasonable care in the screening of its applicants and recommending them for placement with U.S. camps like Camp Stewart. Defendant Camp America owed the Plaintiffs the duty to use reasonable care in selecting, interviewing, vetting and screening candidates to their program. According to its own Interviewer Handbook, Camp America was aware that participants in its program posed a foreseeable risk of sexual abuse to the young boys attending camps that it helped staff. The Handbook demonstrates that Camp America was aware of the general risk of sexual abuse that the nature of its program – placing adults in camp counselor positions where they would work with children. It was foreseeable to Camp America that pedophiles like Zirus would be attracted to their program because of the access the jobs it touted would provide them to potential victims.

22.    Given the particular susceptibility of young children, like the boys involved in this case, Camp America had a duty to use reasonable care in screening applicants to their program. Camp America had the power to deny pedophiles like Zirus entry into their program and assist camp directors in obtaining information relevant and necessary to fully evaluate the threat applicants posed. Camp America agreed to work with camps like Camp Stewart to

facilitate placement of participants in their program in those camps. As a result, Camp America had a duty to act reasonably when recommending participants to American camps. The burden of imposing the duty is small in light of the fact that Camp America has already undertaken a duty to perform some of the screening of its program's participants.

23.     Camp America violated this duty when it failed to follow its own policies concerning references, failed to follow industry standards regarding reference checks, employment checks, volunteer work checks and internet checks.

24.     Camp America's actions were a cause in fact of the Plaintiffs' injuries. According to its own employees, Zirus' application did not meet their own standards because his references were not sufficient and his internet postings, had any effort been made to check them, would have revealed disturbing content that would have eliminated him from the program.

25.     Camp America was also grossly negligent in its failure to properly screen Zirus. It failed to follow its own policies and procedures concerning his application and failed to adhere to industry standards concerning the safe screening of camp employees. By failing to make any effort to check references, verify employment claims or investigate Zirus' volunteer work, Camp America deliberately ignored sources of information that would have revealed the true nature of Zirus' personality and the significant threat he posed to young boys. As a result of this gross negligence, the Plaintiffs are entitled to exemplary damages.

## F.  DAMAGES

26.     As a direct and proximate result of Defendant's conduct, as set forth above, minor Plaintiff is entitled to recover damages from the Defendant as follows:

a.      mental anguish in the past and future;

b.      medical expenses in the past and future;

c.      physical impairment in the past and future;

d.      exemplary damages, without limitation on the dollar amount of exemplary damages, see Tex. Civ. Prac. & Rem. Code §41.008(c)(5)(6);

e.      prejudgment and post judgment interest;

f.      costs of court;

g.      such other relief, at law and in equity, to which Plaintiffs shall be entitled.


Respectfully submitted,

**SAWICKI & LAUTEN, L.L.P.**

**MICHAEL G. SAWICKI**
State Bar No. 17692500
4040 N. Central Expressway, Ste. 850
Dallas, Texas 75204
(214) 468-8844
(214) 468-8845 (Fax)

**ATTORNEY FOR PLAINTIFFS**