UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| J.S. and L.S., As Next Friends of C.S., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | Civil Action No:  SA-12-CA-1036-XR |
| | ) | |
| AMERICAN INSTITUTE FOR FOREIGN | ) | |
| STUDY, INC. d/b/a CAMP AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

On this date, the Court considered Defendant American Institute for Foreign Study, Inc. d/b/a Camp America ("AIFS" or "Camp America")'s Motion for Partial Summary Judgment (docket no. 87) and Motion for Final Summary Judgment (docket no. 101).  Plaintiff is a minor boy who was allegedly molested by a camp counselor at a summer camp in Texas.  Plaintiff filed this lawsuit against Defendant AIFS, alleging that the counselor was sent to the camp through AIFS, a company that works with American camps to place foreign individuals at those camps as part of a cultural exchange program.  Plaintiff asserts claims for negligence and gross negligence, arguing that AIFS breached its duty to use reasonable care in the screening of its applicants and recommending them for placement with American camps.  AIFS moves for final summary judgment, asserting that it owed no duty to Plaintiff, and also moves for partial summary judgment on the claim for past medical expenses.  After careful consideration, the Court denies both motions.

**Background**

C.S. attended Camp Stewart for Boys, Inc. ("Camp Stewart") in the summer of 2009, when he was seven years old.  C.S. was assigned to a cabin led by counselor Scott Zirus. Plaintiff alleges

that he was sexually molested by Zirus.  Zirus is currently serving a forty-year sentence after confessing to molesting two other boys at Camp Stewart that summer.

J.S. and L.S., as next friends of C.S., filed their Original Complaint on October 31, 2012. A First Amended Original Complaint (docket no. 90) was filed on August 12, 2013, and is the live pleading. Plaintiff[1] alleges that "Camp America is a corporation that specializes in finding foreign individuals who wish to work as camp counselors and matching them with camps in the United States that need counselors." Compl. ¶ 5.  AIFS states that Camp America "is a cultural exchange program of Defendant AIFS which works with camps across the nation (including Camp Stewart) in connection with the placement of selected individuals from foreign nations as summer camp counselors here in the United States." Docket no. 101 at 1-2.  Camp America and Camp Stewart entered into a written contract in which AIFS agreed to supply counselor candidates and provide their transportation to Camp Stewart. Compl. ¶ 6.  Pursuant to this relationship, Camp America recommended Zirus, and Camp Stewart hired him as a camp counselor.  Plaintiff alleges that Camp America "actively recruited, prepared and recommended Zirus to Camp Stewart." Docket no. 118 at 6.

Camp America's relationship with Camp Stewart was governed by a "Letter of Agreement," which assigned to Camp America the responsibility "[t]o process complete applications to the Camp America program except those designated as preplaced applicants, returning staff and independent

---

[1]"Plaintiff" as used herein refers to C.S. "[M]inors and incompetents are considered to be under a legal disability and are therefore unable to sue or be sued in their individual capacities; such persons are required to appear in court through a legal guardian, a 'next friend,' or a guardian ad litem." *Intracare Hosp. North v. Campbell*, 222 S.W.3d 790, 795 (Tex. App.–Houston 2007, no pet. ).  A next friend is one who, without being regularly appointed guardian, acts for the benefit of one who is under a legal disability to act. *Id.* at 795-96.  The real party plaintiff in a lawsuit asserted by either a next friend or a guardian is the incompetent person. *Id.* at 796.

admissions" and "[t]o see that applicant interviews are completed (by a Camp America interviewer, or a Camp representative at a Camp Directors' Fair) and to obtain reference letters and assist the Camp with placement of participants."  Docket no. 101 Ex. A.  Camp America would also provide transportation, make appropriate visa arrangements, provide medical insurance, require a criminal background check from participants, and require a medical report from participants.  *Id.*  Camp America "disclaim[e]d any and all liability for any misstatements or omissions contained in the criminal background reports."  *Id.*[2]

Under the Letter of Agreement, Camp Stewart was to "screen all applicants, see that applicant interviews are completed and obtain references for applicants who are designated as preplacements, returning staff and independent admissions," make final selection of the applicant as a participant of the Camp after an independent review and evaluation of the information supplied by Camp America, and "to carefully choose participants with the understanding that there is no warranty as to satisfaction or to the compatibility of any particular applicant."  *Id.*

The Letter of Agreement further states that "[p]articipants are coming to the United States under contractual agreements with Camp America as participants in a cultural exchange program, and thus are not employees of Camp America. Camp America participants are employees of the Camp, as are all J-1 participants.  As the sponsor of this Cultural Exchange-Visitor Program, however, Camp America must, under government regulations, be immediately informed should any

---

[2] Camp America also contracted with participants like Zirus. Docket no. 118 Ex. D ("Applicants who wish to participate on the programme should understand that they enter into a contract with Camp America and will be bound by the following conditions."). Pursuant to that agreement, participants agreed "to co-operate fully with those supervising the programme on behalf of Camp America" and "to abide by any reasonable instructions" given. Camp America also reserved the right to cancel placement without explanation right up to the moment of departure.

serious problems arise between the Camp and participants.  Camp America reserves the right to remove participants when there is evidence of threat to their health, welfare or safety." *Id.*  Further, "If a participant is released from his/her duties or departs prior to completion of nine weeks or the Camp season, the Camp will pay fees and pocketmoney due on a 63-day pro-rata basis.  Should there be any disputes, Camp America will be the arbitrator before the participant leaves the Camp." *Id.*

Plaintiff alleges that Camp America required two references from applicants, and the references provided by Zirus did not meet Camp America's requirements and were not checked. Compl. ¶ 13.  Plaintiff alleges that Camp America also failed to verify Zirus's employment history, check his internet presence, or administer tests that could help predict a threat of sexual abuse.  *Id.* ¶ 14-17.

Plaintiff asserts that Camp America had a duty to use reasonable care in screening applicants and recommending them for placement with U.S. camps like Camp Stewart.  Compl. ¶ 21.  Plaintiff asserts that, according to Camp America's own Interviewer Handbook, it was aware that participants in its program posed a foreseeable risk of sexual abuse to the young boys attending camps that it helped staff, and it was foreseeable that pedophiles like Zirus would be attracted to the program because of access to potential victims.  *Id.*  Plaintiff contends that Camp America had a duty to use reasonable care in screening applicants to the program and had the power to deny pedophiles like Zirus entry into the program and assist camp directors in obtaining information relevant and necessary to fully evaluate the threat applications posed.  *Id.* ¶ 22.  Plaintiff alleges that Camp America violated its duty when it failed to follow its own policies concerning references and failed to follow industry standards regarding reference checks, employment checks, volunteer work

4

checks, and internet checks.  Plaintiff further alleges that Camp America's actions were a cause-in-fact of Plaintiff's injuries because, had any effort been made to check Zirus's background, he would have been eliminated from the program.  C.S. seeks damages for past and future mental anguish, past and future medical expenses, past and future physical impairment, exemplary damages, and interest.

Defendant moves for summary judgment on all claims, asserting that it owed no legal duty to C.S.  In addition, Defendant moves for partial summary judgment on the claim for past medical expenses, arguing that a minor may not recover for past medical expenses, and C.S.'s parents have not filed suit in their individual capacities.

**Analysis**

**A. Legal Standard**

Defendant has filed both of its motions as "traditional" motions for summary judgment pursuant to the Texas Rules of Civil Procedure.  Because this case is based on diversity jurisdiction, Texas substantive law applies.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).  However, federal procedural rules, including federal rules and standards for summary judgment, govern.  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("Texas substantive law, of course, governs this diversity suit.  Rule 56, Fed.R.Civ.P., however, governs the propriety of summary judgment.") (citation omitted).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute about a material fact exists when the evidence presented on summary judgment is such that a reasonable jury could find in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All facts and evidence are viewed in the light most

favorable to the non-movant. *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 516 (5th Cir. 2010).

**B. Motion for Summary Judgment - Duty**

Defendant argues that it had no duty to Plaintiff to prevent the harm at issue here. Defendant asserts that no such duty arose under its contract with Camp Stewart and that it performed all of its duties under the contract. Defendant further contends that no common-law duty exists because Zirus's alleged acts were unforeseeable.

In a prior lawsuit filed by other campers allegedly molested by Zirus in the summer of 2009, this Court previously considered the duty issue. *See C.W. v. Camp Stewart et al.*, SA:10-CV-1044-XR, 2012 WL 3776978 (W.D. Tex. Aug. 29, 2012). The contract between Camp America and Camp Stewart was the same contract relevant to this case. In the prior case, this Court held that the plaintiffs could not rely on the contract to support their argument that Camp America owed them a duty of care, but also held that Texas common law would impose a duty.[3]

Applying Texas's standard common-law duty analysis, this Court reasoned that the risk of sexual abuse was foreseeable to AIFS, even if the exact sequence of events or the particular plaintiff was not, and that the following factors weighed in favor of imposing a limited duty on AIFS/Camp America to act reasonably when recommending participants to American camps like Camp Stewart: the risk and likelihood of sexual abuse are high in these circumstances; Camp America retained some ability to control Zirus; Camp America had written obligations to assist camps like Camp

---

[3] In the prior case, plaintiffs asserted a claim for negligent hiring, supervision, training, and retention, as well as a claim for failure to warn. The Court granted summary judgment on the negligent hiring, supervision, training, and retention claims because Camp America was not Zirus's employer. The Court found a limited duty on the failure to warn claim. In this lawsuit, Plaintiff asserts claims for negligent screening and recommending. The Court finds its prior analysis to be applicable to Plaintiffs' negligent screening and recommending claims.

Stewart with the placement of counselors; and Camp America agreed to facilitate placement of participants in its program at those camps. Although the social utility of the AIFS/Camp America program is high, the Court found that the burden of imposing a duty of reasonable care was small, particularly in light of the fact that Camp America has already undertaken a duty to perform at least some screening of its participants.

AIFS recognizes this Court's prior holding, but argues that the risk involved with the particular assailant (here, Zirus) must be foreseeable to impose a legal duty upon it. AIFS points to *Golden Eagle Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996). This Court relied on *Golden Eagle* in its prior order for guidance in applying the common-law duty analysis, which balances the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *See Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 736 (Tex. 1998) (noting that *Golden Eagle* imposed a duty solely on a straightforward common-law duty analysis).

In *Golden Eagle*, a local church decided to start a boy scout troop. A GSC employee and a district scout committee (a subdivision of GSC) had the responsibility of putting the church in contact with a potential scoutmaster. They introduced to the church a scoutmaster who they had heard was "messing with some boys," without informing the church of what they had heard. *Id.* at 289. The scoutmaster then molested the plaintiff, a member of the boy scout troop. The boy's mother sued GSC and the Boy Scouts of America ("BSA") for negligent failure to properly screen, train, and supervise the scoutmaster and for failure to remove him from his position.

The Texas Supreme Court held that the BSA owed no duty because it had no knowledge of any allegations of sexual abuse by the scoutmaster and had no way of knowing of his past history.

7

The Court therefore held that his actions were not foreseeable to the Boy Scouts and "to place a duty on BSA to screen adult volunteers about whom it has no knowledge and over whom it has little or no control would be a tremendous burden." *Id.* at 290.  Turning to GSC, the Court conducted a traditional duty analysis, and found that the risk of injury to the plaintiff was foreseeable, the social utility of GSC's conduct was high, and the magnitude and consequences of imposing a limited duty on GSC were low.  The Court therefore imposed a limited duty not to recommend a scoutmaster that GSC knew or should have known was peculiarly likely to molest boys, but did not impose a duty on GSC to investigate the scoutmaster.

AIFS contends that it is situated similarly to GSC, and thus it had no duty to investigate Zirus (or presumably any person it recommends as a camp counselor), but only had a duty not to recommend him if it knew or should have known that Zirus was likely to molest boys.  But GSC and AIFS are not similarly situated, as GSC undertook only to recommend a scoutmaster, had no contractual relationship with the church, and was not in the for-profit business of recommending or placing individuals with churches or other requesters.

In contrast, AIFS's business is to "work[] with camps across the nation (including Camp Stewart) in connection with the placement of selected individuals from foreign nations as summer camp counselors here in the United States."  Docket no. 101 at 2.  As part of that business, AIFS already voluntarily undertook certain roles and responsibilities with regard to its "participants," including:  "requiring a criminal record check"; "requiring a medical report from participants"; providing medical insurance; making visa arrangements; making travel arrangements; providing literature on American culture and, where practical, conducting orientations; and arbitrating disputes between participants and camps.  Thus, AIFS agreed to conduct at least some screening of

8

applicants, provide information to Camp Stewart for review and evaluation in selecting an applicant, and facilitate the placement, and it retained some control over the participant after placement. Moreover, AIFS was paid by participants and by the American camps for its services.

Plaintiff presents the testimony of Elizabeth Duffy, an AIFS account representative, who testified that Camp America recruits and vets its participants, and that she tells camp directors that participants are interviewed in person by Camp America staff, and that participants provide references that are checked. Docket no. 118, Ex. B at 92. She testified that she believes that camp directors "rely upon the representation that Camp America will vet the applicants that they send them" because "they pay a premium for that service." *Id.* at 92-93. She testified that camp directors should be able to rely on Camp America to provide quality applicants to start from, but they should be responsible for interviewing the applicant to determine whether they would be "a good fit." *Id.* at 95-96.

The Court declines to change its prior holding regarding a duty under these facts and rejects Defendant's assertion that *Golden Eagle*, *Doe v. Roman Catholic Diocese of Galveston-Houston*, Civ. A. No. H-05-1047, 2007 WL 2817999 (S.D. Tex. Sept. 26, 2007), or *Williams v. United Pentecostal Church Int'l*, 115 S.W.3d 612 (Civ. App.–Beaumont 2003, no pet.) requires it to have known of Zirus's propensity for abuse for the law to impose a duty. As noted, AIFS was not similarly situated to GSC, and thus the Texas Supreme Court's decision not to impose a duty on GSC does not dictate the result as to AIFS. In *Williams*, the defendant at issue was the Texas District of the United Pentecostal Church. The court found no duty on the part of the Texas District to a child molested at a church within the district because the Texas District never recommended the molester to the church, had no right of control over his activities, and there was no evidence that it

had any knowledge of allegations of sexual molestation by the molester prior to his service at the church. *Williams*, 115 S.W.3d at 617.

In *Doe*, the court distinguished *Golden Eagle*, noting that the Archdiocese defendants did not merely "recommend" the molester as a pastoral intern and seminarian to a third party, which made the decision to select him, but "themselves selected [the molester] for that internship after investigating his qualifications and fitness as a seminarian training for the priesthood." *Doe*, 2007 WL 2817999 at *14. The court found that the relationship between the Archdiocese defendants and the molester was "much more like that of an employee and employer than was the relationship between the volunteer scoutmaster and the third-party scout troop" involved in *Golden Eagle. Id.* Because an employer who negligently hires an incompetent or unfit individual may be liable to a third party whose injury was proximately caused by the employee's intentional or negligent act, the court rejected the defendants' argument that they had no duty other than not to negligently recommend the molester. *Id.* The court went on to state that the issue was not whether the defendants breached a duty to investigate the molester, but whether the information that they did learn through the investigation they conducted made it reasonable for them to anticipate that, if selected as a pastoral intern, he would sexually abuse children he would encounter in that role. *Id.* at *15. Rather than supporting AIFS's no-duty argument, this case supports a finding of duty in this case.

In addition, in a somewhat analogous case, *Read v. Scott Fetzer Co.*, 990 S.W.2d 732 (Tex. 1998), the Texas Supreme Court held that the defendant, by retaining control over vacuum cleaner sales by requiring in-home demonstrations, had a duty to exercise its control reasonably. The plaintiff alleged that the defendant had a duty to take reasonable precautions to minimize the risk

to its customers from coming into contact with vacuum dealers who had criminal and/or psychiatric records, and the Court characterized the claim as being that the defendant was negligent through its own conduct of creating an in-home marketing system without adequate safeguards to eliminate dangerous salespersons from its sales force.  *Id.* at 735.  The Court in *Read* did not require that the defendant be aware of the risk of the particular perpetrator before imposing a duty.  Similarly, given that AIFS has undertaken to conduct some screening of participants and to recommend participants for placement in children's summer camps, knowing that camp directors will rely on its recommendations, AIFS has a duty to act reasonably in screening applicants and recommending them for placement.  The motion for summary judgment on the basis of no duty is denied.

## C. Motion for Partial Summary Judgment - Minor's Medical Expenses

AIFS seeks a partial summary judgment on C.S.'s claim for certain medical expenses. AIFS asserts that a minor plaintiff does not have standing to recover for past medical expenses because the right to recover for medical expenses prior to the age of majority belongs to the minor's parents, and C.S.'s parents have not sued in their individual capacities.  *See Sax v. Votteler*, 648 S.2d 661, 666 (Tex. 1983) ("Historically, in Texas, the right to recover for medical costs incurred in behalf of the minor is a cause of action belonging to the parents, unless such costs are a liability as to the minor's estate."); *Garcia v. Cerda*, Civ. A. No. 07-12-168-CV, 2013 WL 3788509, at *2 (Tex. App.–Amarillo July 15, 2013, no pet.) ("Texas law has long held that the cause of action for recovery of reasonable and necessary medical expenses incurred by a minor belongs to the minor's parents.").  AIFS notes that the April 15, 2013 scheduling order deadline for amending pleadings has passed, and argues that it is too late for C.S.'s parents to amend to bring claims in their

11

individual capacities.  AIFS therefore contends that summary judgment is appropriate.[4]

In response, Plaintiff concedes that C.S. may not recover the medical expenses incurred while he is a minor.  Docket no. 104 at 3 ("Plaintiffs agree that in Texas a claim for a minor's medical expenses prior to the age of majority belongs to the parents of the minor.").  However, Plaintiff seeks leave to amend to add the parents' individual claims.[5]  Plaintiff cites the liberal amendment standard of Rule 15 and argues that Defendant would not be prejudiced by the amendment because it has known of this claim throughout the litigation.  In the alternative, Plaintiff contends that summary judgment is not warranted because the parents "can and will assign their claim for medical expenses damages" to C.S.  Docket no. 104 at 4.

AIFS replies that amendment should not be permitted, nor would an assignment be beneficial, because the claim for past medical expenses is barred by limitations.  AIFS notes that C.S. was injured in the summer of 2009, and argues that his parents would have had to bring their claim for medical expenses or assign those claims to C.S. within the two-year limitations period that governs personal injury claims.[6]  As will be discussed herein, however, the statute of limitations for

---

[4] Defendant filed its motion for summary judgment with regard to the claims in the Original Complaint.  After the motion was filed, Plaintiff filed a First Amended Complaint (docket no. 90). Plaintiff was given leave to file an amended complaint at the July 17, 2013 hearing, to include allegations that Plaintiff had been sexually molested by Zirus while at Camp Stewart. Tr. at 66.  The First Amended Complaint added paragraph 27, which alleges that C.S. was sexually molested by Zirus at Camp Stewart and that he suffered damages as a result.  The First Amended Complaint, like the Original Complaint, asserts only claims by C.S. (through his parents as next friends) and not by his parents individually.

[5] Plaintiff did not attach a proposed Amended Complaint to the response and incorporated motion for leave to amend, which is the preferred practice. However, the nature of the proposed amendment is straightforward.

[6] The Court notes that because C.S. is a minor, he is considered to be "under a disability" and "[i]f a person entitled to bring a personal action is under a legal disability when the cause of action accrues, the time of the disability is not included in a limitations period."  TEX. CIV. PRAC. & REM.

personal injury claims arising from sexual abuse is five years, not two.  TEX. CIV. PRAC. & REM.
Code § 16.0045.

The Court thus considers whether leave to amend should be granted.  Plaintiff's request for
leave to amend is made after the expiration of the scheduling order deadline to file motions to
amend.  Accordingly, Rule 16(b) governs, and Plaintiff "must show good cause for not meeting the
deadline before the more liberal standard of Rule 15(a) will apply."  *Sw. Bell Tel. Co. v. City of El
Paso*, 346 F.3d 541, 546 (5th Cir. 2003).  Four factors are relevant to good cause: (1) the explanation
for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential
prejudice in allowing the amendment; and (4) the availability of a continuance to cure such
prejudice.  *Id.*

If the Court determines that good cause exists, the more liberal amendment standard of Rule
15 applies.  Rule 15 provides that leave to amend pleadings "shall be freely given when justice so
requires," FED. R. CIV. P. 15(a)(2), but the decision to grant or deny a motion to amend is within the
sound discretion of the trial court.  *Avatar Exploration, Inc. v. Chevron, U.S.A., Inc.*, 933 F.2d 314,
320 (5th Cir. 1991).  In exercising its discretion, the trial court considers such factors as undue
delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies
by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the
amendment, and futility of amendment.  *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981)
(citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Court first considers the good cause factors.  Plaintiff offers no explanation for the
failure to timely move for leave to amend, though it can be inferred that Plaintiff was unaware of

---

CODE § 16.001.  Therefore, the statute of limitations has not begin to run on any of C.S.'s claims.

the need for leave to amend until Defendant filed the motion for summary judgment on August 6. The amendment is important, because denial of the motion would mean a reduction in damages awarded should Plaintiff prevail at trial.   Defendant demonstrates no potential prejudice from allowing the amendment, and Plaintiff correctly notes that amendment to allow the claim would not be a surprise, since Defendant has known of the claim since the inception of this lawsuit, and it is only a matter of whether C.S. or C.S.'s parents assert the claim.   Last, no continuance would be necessary.   Accordingly, the Court finds good cause to amend the scheduling order deadline.

Turning to the Rule 15 factors, the Court finds no undue delay because, as noted, there is no reason to believe that Plaintiff was aware of the need for the amendment until Defendant filed the motion for summary judgment.   In response, Plaintiff promptly moved for leave to amend.   The Court also finds no bad faith or dilatory motive.   The Court finds no prejudice to Defendant in allowing the amendment.   The only objection asserted by Defendant is its argument that the claim for medical expenses is barred by a two-year statute of limitations.   However, as noted above, § 16.0045 creates a special five-year statute of limitations for sexual abuse claims, instead of the two-year statute of limitations applicable to most personal injury claims.

The Fourteenth Court of Appeals has held that this statute of limitations applies to claims against a defendant alleged to have proximately caused the injuries, not just to claims against the abuser. *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of S. U.S.*, 362 S.W.3d 656 (Tex. App.–Houston [14th Dist.] 2011, pet. denied) (noting that the plain language of the statute covers any personal-injury type claims arising out of sexual assault).   Although the Court has not been able to locate any cases discussing the application of § 16.0045 to claims for medical expenses asserted by the parents of the victim, the Court concludes that § 16.0045 would apply to those claims.

14

Section 16.0045 is not limited to suits or claims by the victim, but states that "any person" must bring suit for personal injury not later than five years after the day the cause of action accrues if the injury arises as a result of conduct that violates" certain provisions of the Texas Penal Code related to sexual assault. Plaintiff's parents are persons bringing suit for their damages incurred as a result of the personal injury of C.S., and thus the Court concludes that the statute of limitations in § 16.0045 applies to the parents' claims for medical expenses.[7]  Therefore, Defendant fails to establish that amendment would be futile.  Accordingly, the Court concludes that leave to amend should be granted, and the motion for summary judgment should be denied.

### Conclusion

Defendant's motion for final summary judgment (docket no. 101) is DENIED and Defendant's motion for partial summary judgment (docket no. 87) is DENIED.  Plaintiff is granted leave to amend the complaint to assert claims by the parents in their individual capacities for C.S.'s medical expenses during minority, and Plaintiffs must file their amended complaint within seven days of this Order.

It is so ORDERED.

SIGNED this 12th day of September, 2013.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[7] Even if § 16.0045 does not apply to the parents' claims for medical expenses incurred while the victim is a minor, Defendant has not negated the application of the various tolling provisions that might apply, such as the discovery rule.

15