UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| J.S. and L.S., As Next Friends of C.S., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | Civil Action No:  SA-12-CA-1036-XR |
| | ) | |
| AMERICAN INSTITUTE FOR FOREIGN | ) | |
| STUDY, INC. d/b/a CAMP AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

On this date, the Court considered Defendant American Institute for Foreign Study, Inc. d/b/a Camp America ("Camp America")'s motions to exclude certain opinions offered by three of Plaintiffs' expert witnesses.

**Background**

C.S. attended Camp Stewart for Boys, Inc. ("Camp Stewart") in the summer of 2009, when he was seven years old.  C.S. was assigned to a cabin led by counselor Scott Zirus. Plaintiff alleges that he was sexually molested by Zirus.  Zirus is currently serving a forty-year sentence after confessing to molesting two other boys at Camp Stewart that summer.

J.S. and L.S., as next friends of C.S., filed their Original Complaint on October 31, 2012. A Second Amended Complaint (docket no. 131) was filed on September 13, 2013, to add claims by the parents individually, and is the live pleading. Plaintiffs allege that "Camp America is a corporation that specializes in finding foreign individuals who wish to work as camp counselors and matching them with camps in the United States that need counselors." Compl. ¶ 5.  AIFS states that

1

Camp America "is a cultural exchange program of Defendant AIFS which works with camps across the nation (including Camp Stewart) in connection with the placement of selected individuals from foreign nations as summer camp counselors here in the United States."  Docket no. 101 at 1-2. Camp America and Camp Stewart entered into a written contract in which AIFS agreed to supply counselor candidates and provide their transportation to Camp Stewart. Compl. ¶ 6.  Pursuant to this relationship, Camp America located and recommended Zirus, and Camp Stewart hired him as a camp counselor.  In a prior Order, this Court denied AIFS's motion for summary judgment, holding that the summary-judgment evidence indicated that AIFS had a duty to Plaintiffs to use reasonable care in screening and recommending participants.

Plaintiffs seek to introduce the testimony of three expert witnesses, whom Defendant moves to exclude.  Danielle Shaw, Michael J. Peterson, and David T. Dunagan have each been designated to testify how "Camp America and their employees, agents, representatives breached the applicable standard of care, and that said negligence was the proximate cause of Plaintiffs' injuries made the basis of this suit."  Defendant raises various challenges to these experts' proposed testimony. Defendant contends that Peterson is not qualified to render his opinions, that his opinions are unreliable, and his testimony is not helpful to the jury.  Defendant asserts that Shaw is not qualified to render her opinions, that her testimony is not reliable, that her testimony is not helpful to the jury, and that her testimony amounts to improper legal conclusions.  Defendant asserts that Dunagan is unqualified to render his opinions and that Dunagan's testimony is not reliable and is unhelpful to the jury.

**Legal Standards**

State law governs the substance of this case, but "the Federal Rules of Evidence control the

admission of expert testimony." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).  Experts qualified by "knowledge, skill, experience, training or education" may present opinion testimony to the jury. FED. R. EVID. 702. Whether an individual is qualified to testify as an expert is a question of law.  *Mathis*, 302 F.3d at 459 (citing FED. R. EVID. 104(a)).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.  *Id.* (citing *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) (reasoning that "most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility")).

   "A party seeking to introduce expert testimony must show '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007).  The trial court acts as a gate-keeper, making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).  In short, expert

testimony is admissible only if it is both relevant and reliable. *Pipitone*, 288 F.3d at 244. This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony. *Id.* However, "the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility, and should be left for the jury's consideration.'" *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss* ., 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chm. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

**Analysis**

**A. Michael J. Peterson**

Michael Peterson is an "expert on camp and conference center management." He has a bachelor's degree in sociology and has extensive experience as a CEO and director of various camps since 1973. Docket no. 99, Ex. B. Peterson states he had responsibility for "recruitment, screening, hiring, training, evaluation, and supervision of up to 200 camp staff employees each season and well over 3600 specialized youth camp and child care employees." Docket no. 99, Ex. C. Peterson also has experience with camp industry standards. *Id.* Peterson opines that Camp America "failed to follow known industry standards as well as its own safety procedures in presenting Zirus to camp clients" and that "the process used was flawed and inadequate." *Id.* He states that "there were so many red flags and errors that there is no question . . . Zirus should have been eliminated from consideration based on reasonable question and doubt, if not discovered for what he was outright." *Id.*

Camp America generally argues that: (1) Peterson is not qualified to testify that Camp

4

America would have found damaging information on Zirus if it had conducted an internet search and his opinion is unreliable; (2) Peterson is not qualified to testify that Camp America should have eliminated Zirus during the screening process because he exhibited characteristics that indicated he was likely a pedophile and his opinion is unreliable; (3) Peterson's opinion that Camp America failed to follow industry standards is unreliable because the ACA guidelines do not apply to Camp America and his opinion is contradicted by the industry standard (ACA guidelines) upon which he purportedly relies because Camp America complied with ACA guidelines; and (4) Peterson's testimony that Camp America failed to follow its own policies is not helpful to the jury.

> 1. whether Peterson is qualified to testify that Camp America would have found damaging information on Zirus if it had conducted an internet search and whether his opinion is reliable

Peterson opines that by 2005 online searches for records or entries on the internet related to camp counselor candidates was "fully industry standard," but this check was never done for Zirus. Docket no. 99, Ex. C.  Camp America seeks to exclude Peterson's opinion that "[a]n effort of no more than ten minutes is not unreasonable and in this case would have turned up information very damaging to the Zirus application."  *Id.*  Camp America argues that Peterson "is not qualified to testify to the internet information that was available regarding Zirus prior to his hire or the length of time it would have taken to locate some information" because he has no forensic internet expertise.  Further, Camp America contends his opinion is unreliable because he does not explain the methodology he used to form his opinion and simply states a conclusion.

The Court agrees with Camp America.  Although Peterson is qualified to testify what the industry standard was in 2008 with regard to internet searches, he has not demonstrated that he is qualified to testify what such a search would have revealed about Zirus in 2008.  The motion to

exclude this aspect of Peterson's testimony is granted.

### 2. whether Peterson is qualified to testify that Camp America should have eliminated Zirus during the screening process because he exhibited characteristics that indicated he was likely a pedophile and whether his opinion is reliable

Camp America contends that Peterson is not qualified to testify that there are certain characteristics indicating an applicant is likely a pedophile, that Zirus exhibited those characteristics, or that Camp America should have excluded Zirus based on those characteristics.

Peterson testifies that organizations who serve children should be aware of the serious danger of infiltration by pedophiles and should have practices and procedures in place to reduce or eliminate that likelihood. Peterson states there are "extensive resource tools" available to train persons making hiring decisions in how to effectively screen applicants, including recognizing red flags, conducting probing interviews, evaluating answers, reviewing cumulative information, interpreting body language, and validating and using references and previous employer checks as part of a comprehensive process to make educated selections. He further testified that "there are many lists of applicant exhibited 'red flags' available to HR and hiring professionals in the camp and the youth service industry." As an abbreviated sample of such a resource, he uses "materials included in the hiring resource tool packet for youth serving agencies from the 'Non-Profit Risk Management Center' (NPRM) dating back to 2000, and frequently cited and used by ACA [the American Camp Association] in workshops and training."

In his report, Peterson then lists "macro characteristics of a typical abuser/pedophile," including: (1) often over age 25, male; (2) is generally single, with no solid or established relationship with a partner; (3) often unemployed, under employed or has history of gaps in employment; (4) comes across as charming, intelligent, etc.; (5) has no solid career focus or track -

prefers volunteer activities; (6) was abused himself or mistreated as a child; and (7) is often described as "too good to be true!"

Peterson then lists "application/interview red flags consistent with most pedophiles," which includes: (1) frequent unexplained moves; (2) gaps in employment or obvious under employment, unstable employment; (3) prefers hobbies and interests that are 'child like' or normally associated with boys; (4) no current romantic/partner relationships; (5) history of abuse, neglect, etc.; (6) gravitates toward activities involving children; (7) over enthusiastic in stating affection/ care/consideration of children; (8) weak evidence of long term, lasting commitments to people, usually with no child of his own; (9) often dependent on "the system" or institutions rather than family; (10) low self esteem; (11) often shows preference to work with frail, vulnerable or emotionally dependent children; (12) speaks of children in excessively glowing terms - uses inappropriate adjectives; and (13) history of taking trips with children or placing them in isolated situations. Peterson states that he can identify numerous statements in McNaughton's interview report "that immediately raise a red flag based on even these brief published industry standards."

Peterson states that Zirus "had a number of jumps in employment and gaps in full-time or verified paid employment. His history was unstable. This is a red flag for any experienced and trained screener. Mr. McNaughton, who had no clear and purposeful training since 1998 (and actually none of the subject of safe screening), made no effort to fill in the gaps or seek reasonable, validated explanations and Camp America backed him up. Indeed Mr. McNaughton actually seemed infatuated by this unsettled lifestyle- a clear red flag - thus showing his naivety and inexperience (or bias), in my opinion." Peterson also opines that questions left unanswered can be a red flag, and Zirus did not answer the question whether he had "ever been the victim of attempted suicide or self

harm." Peterson lists numerous "red flags" that he "easily recognize[d]" in the Zirus application. Peterson opines that these red flags required additional questions and lines of exploration. Peterson concludes that "there were so many red flags and errors that there is no question in my mind Zirus should have been eliminated from consideration based on reasonable question and doubt, if not discovered for what he was outright."

Camp America argues that Peterson does not have the education or experience necessary to qualify him to opine on these matters. Camp America asserts that Peterson can only speculate that he has eliminated pedophiles from hire based on the characteristics to which he refers. Although Peterson states that he reviewed certain material available from the Non-Profit Risk Management Center ("NRMC"), Camp America contends this is insufficient to qualify him as an expert because an individual's review of literature in an area outside his field does not make him any more qualified to testify as an expert than a lay person who read the same articles. Further, Camp America states that Peterson only relied on the NRMC article and online tool kit, and these are not scientific resources.[1] Camp America notes that Peterson does not cite any scientifically recognized methods for determining whether pedophiles are more likely to be eliminated from hire based on the characteristics that Peterson cites, and asserts that there are no such scientific authorities. Therefore, Camp America argues, the foundational data underlying Peterson's opinion are unreliable. Camp America also states that Peterson's opinions were formed for this litigation and have not been peer-reviewed.

Peterson's experience as a camp director, including his experience in recruiting, screening,

---

[1] This is inaccurate, as Peterson's report clearly states that he "also conducted a general survey of available published materials on the subject of camp staff hiring, screening, training and supervision as well as all related ACA standards."

8

and hiring applicants, and his experience with camp industry standards, qualifies him to testify regarding industry standards for screening and hiring applicants. As such, he may testify concerning what tools and resources are available to and used by camps and youth serving agencies to screen staff for potential abusers. He does not need to be a psychologist or psychiatrist to testify on this matter, as suggested by Camp America.

Camp America argues that Peterson's use of the NRMC article and online tool kit are simply an individual's review of literature outside his field, and does not qualify Peterson as an expert. However, Peterson does not rely on his review of these resources to establish his expertise. Rather, his field of expertise is the camping industry, including specifically screening and hiring staff, and his reference to the NRMC article and toolkit is expressly stated to be a sample of the hiring resource tools available to youth serving agencies for screening out potential abusers.

It is true that Peterson does not cite any authority, scientific or otherwise, to prove that "pedophiles are more likely to be eliminated from hire based on the characteristics Peterson references in his report than applicants who are not pedophiles" or that "there is a correlation between the characteristics referenced in his report and pedophilia." However, he does state that camps and youth serving agencies should have practices and procedures to reduce or eliminate the likelihood of hiring pedophiles, that there are many lists of "red flags" available to HR and hiring professionals in the camp and the youth service industry, and that the criteria are "frequently cited and used by ACA in workshops and training." Camp America's own expert, Robert Ditter, also states that "[s]ince at least 1987 extensive tools and training have been made available to camp professionals regarding safe practices of screening, training, supervising and evaluating camp staff." Peterson's report indicates that these types of lists of "red flags" are used by hiring professionals in

9

the camp and youth service industry, and Camp America has not shown otherwise.  In fact, Camp America's own "Interviewers Handbook"recognizes that certain factors should be determined and evaluated, including whether the candidate: (1) has a history of sexual or physical abuse; (2) seems "over interested" in children (work and social history seems to be unusually focused on activities with children, to the exclusion of normal peer relationships, because abusers are often loners who are unable to formulate or maintain close adult relationships); (3) lacks normal peer relationships; (4) has had frequent and sudden changes of address and occupation; (5) is obviously older than normal applicants; (6) and has an "obsessive or secretive attitude to children."  The Handbook also states that "it is legitimate to enquire about the marital and family history of applicants."   Whether the resources used by Peterson form an appropriate basis for Peterson's opinion goes to the weight and not the admissibility of his testimony.  *14.38 Acres of Land*, 80 F.3d at 1077 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

### 3. whether Peterson's opinion that Camp America failed to follow industry standards is unreliable

Camp America argues that Peterson fails to explain why he concluded that the ACA guidelines apply to Camp America, which is not a youth camp, and that Camp America complied with them in any event.  However, the Court notes that Camp America's expert, Robert Ditter, adopts the ACA standards "to establish the standard of care in the industry on the matters of background checks, interviews and references" and for "the question of the number of references required by a camp *or referring agency such as Camp America*."  The Fifth Circuit has stated that a party may not complain about an expert's citation to certain standards when its expert also cited

and relied on those standards.  *Green v. Schutt Sports Mfg. Co.*, 369 F. App'x 630, 637 (5th Cir. 2010).  In addition, Peterson does not state that the ACA guidelines are the governing standard of care for Camp America.

Camp America further argues that the article and online tool kit published by the NRMC are not recognized as an industry standard, and Peterson has not cited any authority showing that they have been recognized as a standard in the youth camp industry.  As noted, Peterson states that youth serving organizations must have written hiring procedures and policies, and that extensive resource tools are available to train persons making hiring decisions in how to effectively screen applicants, including recognizing red flags, conducting probing interviews, evaluating answers, reviewing cumulative information, interpreting body language and validating and using references and previous employer checks as part of a comprehensive process in order to make educated selections.  Peterson cites the NRMC as an example of such an available tool, and states that the NRMC materials are "frequently cited and used by ACA in workshops and training."  And as noted, Camp America's own expert, Robert Ditter, also states that "[s]ince at least 1987 extensive tools and training have been made available to camp professionals regarding safe practices of screening, training, supervising and evaluating camp staff."  Whether the NRMC tool is demonstrative of the types of tools used in the industry can be explored through cross-examination and Defendant may offer its own expert testimony on such issues.  Defendant's arguments go to the weight rather than the admissibility of the testimony.

Camp America further argues that, to the extent Peterson contends that the ACA guidelines support his conclusions, his testimony should be excluded because he does not apply the guidelines reliably to the facts of the case and the evidence shows that Camp America complied with the

11

guidelines.  Specifically, Camp America contends that, while Peterson states that Camp America should have required Zirus to submit three confidential references who knew him for at least two years, ACA standard HR-4C recommends two references, not three, and Zirus submitted two references.  Camp America states that the ACA guidelines do not designate the minimum length of time that references should have known the applicant or require that references be confidential. Therefore, Camp America argues, Peterson offers only his own "say so."

Camp America mis-characterizes Peterson's testimony.  Peterson does not state that ACA guideline HR-4 is the applicable standard of care; that is Camp America's expert's position. Peterson's report clearly states, "It is the recommendation of NRMC (referenced by ACA as a resource) and most materials focused on safe youth care worker hiring that at least <u>three</u> personal references be gathered on candidates."  It also states, "It is further represented by NRMC and others that the referees selected should have known the individual for at least two years."  Because Peterson does not opine that the ACA guideline reflects the applicable standard of care, the fact that Camp America and its expert contend that Camp America complied with ACA guidelines does not render Peterson's opinion unreliable.  It is for the jury to decide which party or expert to believe.

With regard to McNaughton's interview, Camp America argues that Peterson does not support his opinion that the interview was not a true interview and failed to meet essential screening and suitability requirements.  Camp America asserts that the basis for Peterson's conclusions are not explained, and he does not explain why McNaughton was not adequately trained or skilled or what additional questions he should have asked.

However, Peterson does explain the basis for his conclusion that the McNaughton "interview" was not a true interview and failed to meet essential screening and suitability

requirements.  He states that his "expectation of an interview is that it is conducted by experienced, trained persons, is based on a structure which addresses the organization's mission (first line of defense!), and has some value other than the apparent intent by McNaughton of determining social suitability, language skills, and activity placement skills (deposition).  There is a large difference between a proper job placement interview and a social visit.  In my opinion what was conducted met few of the essential screening and suitability requirements - particularly those of high concern to the industry."  Peterson states that the interviewer should use "a scripted or structured interview" and "there are a number of lines of questioning that should be pursued to support a safe hiring decision." He states that "the NRMC and many other groups provide sample question sets for free and with them a discussion of interpretations of possible answers."  Peterson further asserts that McNaughton was negligent in conducting due diligence by failing to recognize and investigate red flags, and in recommending Zirus at all or before "an in-depth review of various circumstances identified in the application packet."

In addition, Peterson states that it "would not be unreasonable to assume that Camp America would be using interviewers who are trained and skilled in screening for unsuitable candidates," yet the interview conducted by McNaughton "as per his notes and his deposition, exhibited no use of or grasp of intentionality or known screening techniques.  Simply asking a candidate if they have ever been convicted of a crime, as he testified to, does not meet the criteria any reasonable person would anticipate."  Peterson asserts that Defendant's expert, Robert Ditter, and NRMC state that "a structured and probing interview is an important part of the screening process" and NRMC stresses following up and probing any detail and provides resource tools with a list of free, highly focused questions that should be asked.  Peterson states that "interview" connotes a level of competency,

13

purpose, and significance and the interviewer should have the necessary skills. Peterson opines, "I believe that what Camp America did in this instance was not an industry standard interview but rather a simple pre-screening informational session with Scott Zirus." Peterson further notes that additional questions and lines of exploration should have been followed, and "[a]n experienced interviewer would have had concerns and immediately asked follow up questions and/or sought verifications."

Although Peterson could have provided greater detail and specificity, he includes sufficient reasoning to support his conclusion that McNaughton's interview did not meet industry standards. Although the Court agrees with Camp America that Peterson should have specified the "additional questions and lines of exploration that should have been followed," his failure to do so does not render his opinion unreliable, given that he references a source for such questions that can be accessed. Any deficiencies in this aspect of McNaughton's testimony can be explored on cross-examination.

Camp America also challenges the facts upon which Peterson bases some of his opinions, asserting that the facts contradict some of his assertions and arguing that a district court may properly exclude an expert's opinion when it is "not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position." *See Guillory v. Domtar Industr., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). Specifically, Camp America takes issue with Peterson's opinion that McNaughton was not trained and skilled in screening for unsuitable candidates and that McNaughton simply asked Zirus whether he had been convicted of a crime. The Court finds that these arguments have some merit.

Peterson's report states that McNaughton "had no clear and purposeful training since 1998

14

(and actually none on the subject of safe screening)."  However, this is not entirely consistent with

McNaughton's deposition testimony.  In his deposition, McNaughton stated that he received training

in 1997, but he could not recall the content of that training, including whether he was trained on how

to evaluate an individual's propensity for potential harm to children.  McNaughton depo. at 112.  He

stated that, since then, he had received periodic update or refresher training approximately every two

years.  *Id.*  He stated that the interviewer team is pulled together for a "pow-wow training session"

to address changes in procedures, and "part of that certainly would be a point where there is a

discussion regarding identifying potential people of interest, let's say."  *Id.*  McNaughton was asked

what he recalled being told about what to look for with respect to identifying this population of

people, and he responded, "Specifically, things to be aware of would be people of an age older than

the average, older than your typical applicant, who, you know - as -as to their motivation, whether

they are currently working in a field related to teaching, child care or a relevant field, or even sports

programming.  Things that would be flagged and of particular interest would be people who have

not had any - any activity, training, teaching, coaching, so on and so forth, relating to young people.

. . . Or people of interest would include people who don't articulate an intention to pursue teaching,

training, coaching.  Really what we are looking for is what the person is seeking to get out of this

experience and how it will be relevant and how it will help them with their - with their future plans."

*Id.* at 113-114.  McNaughton also stated that the portion of the Interviewers Handbook on "Child

Protection - Abuse Issues" was "discussed at every training session."  *Id.* at 116.  Later in the

deposition, McNaughton again testified that the bi-annual training included child protection issues

in "the form of a formalized group discussion" and they are "advised on how to screen and identify

what makes for a suitable applicant and we discuss potential signs of- of behaviour which would not

be conducive to a camp environment, which may show signs of intent to do ill will." *Id.* at 238.

Accordingly, Peterson's statement that McNaughton had received "no clear and purposeful training since 1998 (and actually none on the subject of safe screening)" is inaccurate, to the extent it implies that McNaughton received no training on safe screening. The Court agrees that Peterson should not be permitted to make such statements at trial or to base opinions on such a statement or conclusion.

However, it is evident that Peterson believes that McNaughton's training was inadequate, and this ruling is not intended to limit Peterson's testimony on that opinion, so long as it does not clearly misrepresent the facts. The Interviewers Handbook states that "potential warning signs" would "require exploration." It states that the interviewer should question older applicants "why an older person wants to spend the summer with younger people" and states that, if the interviewer asks "questions in an informal and relaxed manner and are responded to in an aggressive or evasive manner, you have grounds for suspicion and should probe further." It also implies that the interviewer should obtain reasons for frequent and sudden changes of address and occupation. Peterson may be permitted to testify regarding whether Camp America adequately provided "back-up or effective structured screening tools and training" and whether Camp America provided "specific guidance to staff as to how to proceed to make such a determination (recognizing a potential child abuser) or strong direction to them to pursue questions that might expose red flag determiners/traits and follow up on them," provided that he accurately represents the underlying facts.

Similarly, the Court agrees that Peterson somewhat mischaracterizes the interview when he says that McNaughton "simply asked a candidate if they have ever been convicted of a crime, as he testified to." McNaughton testified that he spoke with Zirus for an hour and a half, and testified to

his usual interview protocol, which involved more than simply asking a candidate if he had ever been convicted of a crime.  Again, Peterson may testify concerning his opinion of the adequacy of the interview and its compliance with industry standards, so long as he accurately reflects the underlying facts.

### 4. whether Peterson's testimony that Camp America failed to follow its own policies is helpful to the jury

Camp America argues that Peterson's testimony that Camp America failed to follow its own policies is not helpful to the jury because Camp America's policies are clear and uncomplicated, and the jury is capable of reading them and applying them to the evidence to determine whether Camp America followed them.

The requirement that expert testimony "assist the trier of fact" means the evidence must be relevant.  *Mathis*, 302 F.3d at 460 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)). Rule 401 defines relevant evidence as that which has "any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.  Therefore, the expert's proposed opinion should assist the trier of fact to understand or determine a fact in issue.  *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 591-92). The Court agrees that the jury is capable of reading Camp America's policies and determining from the evidence whether Camp America complied with them, and that this testimony would not assist the jury.  Thus, Peterson will not be permitted to testify that Camp America failed to follow its own policies simply for the sake of offering that testimony.  However, the Court will consider at trial whether Peterson may testify to this issue if it is relevant and necessary to his other testimony.

**B. Danielle Shaw**

Shaw's report states that it provides her "opinions related to staff hiring practices for organizations that provide staff for programs serving youth as it relates to child protection practices." Shaw's report contains the following opinions: Camp America failed to exercise its own accepted duty of care; it did not provide sufficient training and/or adequate oversight of interviewers; it did not comply with its own published policies; it did not meet the level of accepted practices in a number of areas; it failed to ensure its own child protection training and policies were being enforced by those directly responsible for screening applicants placed at camps; it failed to address obvious warning signs that indicate a tendency toward child abuse; it failed to enforce policy to ensure reference forms met its written standards; it failed to perform an adequate reference check; and it failed to apply safe employment practices consistently.

Defendant raises the following challenges: (1) Shaw is not qualified to render opinions that Camp America failed to address warning signs that Zirus's references, employment history, and interview answers indicated a tendency toward child abuse; (2) her testimony that Camp America failed to comply with its own published policies is not helpful to the jury; (3) her testimony regarding the alleged duties Camp America owed contains improper legal conclusions; and (4) her testimony that Camp America failed to comply with industry standards is unreliable.

> 1. whether Shaw is qualified to render opinions that Camp America failed to address warning signs that Zirus's references, employment history, and interview answers indicated a tendency toward child abuse and whether her opinions are reliable

Shaw's report states that "[b]ased on Testimony, red flags emerged at various stages." She states that verification of the information provided by the applicant to confirm accuracy "is a necessary tool in the screening process" and "[i]nformation revealed in testimonies regarding the

number and variety of previous residences and employment should have warranted further application review," but there was no proof that this occurred. Shaw states, "Testimony regarding the interview revealed information obtained during the interview from the applicant that should have raised red flags enough to at least warrant more follow-up. For example, the interview report reveals what was heralded by the interviewer as 'one hell of a camp fire story.' If Camp America where [*sic*] implementing industry accepted practices, I would expect to see a systemized interview question form completed by the interviewer indicating additional detail that supports this statement as well as appropriate follow-up questions." Thus, as Camp America notes, Shaw is essentially testifying that the number and variety of previous references and employment, as well as information obtained during the interview "raised red flags" of a potential child abuser, and Camp America failed to address them.

Camp America contends that Shaw's testimony should be excluded because she is unqualified and her opinions are unreliable. Shaw has a bachelor's degree in exercise and fitness management, and is working toward a master's degree in library science. Camp America contends that Shaw "does not possess the requisite education to opine regarding the behaviors indicative of a pedophile." Although Camp America acknowledges that Shaw has experience hiring and screening applicants to youth programs, Camp America contends that she "does not possess the experience necessary to qualify her as an expert" and that she "can only speculate that, in her experience, she has eliminated pedophiles from hire based on the factors she references in her report." Docket no. 97 at 5-6. Camp America argues that pedophiles do not readily admit being pedophiles, and thus Shaw can only speculate that persons she has decided not to hire based on certain factors were in fact pedophiles, rendering her opinion speculative. Camp America further

contends that the "only authority upon which Shaw purportedly relies to support her opinions is ACA guidelines and an article," but "[a]n individual's review of literature in an area outside his field does not make him any more qualified to testify as an expert . . . than a lay person who read the same articles." *Id.* at 6.  Camp America also notes that Shaw does not rely on any scientific authority to support her conclusion that there is a correlation between the characteristics she cites and pedophilia, and there are no such authorities.  Camp America contends that "[t]here is no scientifically recognized method to determine whether pedophiles are more likely to be eliminated from hire based on the characteristics Shaw references in her report than persons who are not pedophiles." *Id.*  Camp America therefore argues that Shaw's opinions, which lack foundation, and have not been subjected to peer review or accepted in the scientific community, are unreliable.

The Court agrees that Shaw is not qualified by her education, but the rules permit an expert to be qualified by "knowledge, skill, experience, training or education." FED. R. CIV. P. 702.  Shaw's resume states that she is an expert in "Youth camps - Youth Development; Safety - Standards - Quality Control - Crisis/Emergency/Interim Management."   Docket no. 97, Ex. B.  Shaw's employment history includes: (1) human services coordinator, City of Denton; (2) Director of Operations, Dallas AfterSchool Network; (3) Executive Director, American Camp Association; and (4) Director of Youth and Outdoor Programs, Camp Fire, USA.  *Id.*  Shaw's resume indicates that she has "recruited, trained and supervised as many as 7 full-time; 250 seasonal and part time staff; and more than 150 volunteers annually."  She has "special event, program and meeting management [experience] including directing camps and youth development programs."  *Id.*

Her report states that her "experience comes from serving in the camp and youth development industries for more than 16 years."  Docket no. 97, Ex. C.  From 1995 to 1999, her

20

"primary responsibilities included serving as director of camp and youth programs for the Lonestar Council of Camp Fire in Dallas, Texas" and her "work involved the hiring and screening of paid and volunteer staff that delivered a variety of programs to youth ages 4 -17."  *Id.*  She was involved in "developing curriculum; writing and implementing policies and procedures for Camp Fire; and training other staff and agencies in the practice of staff hiring and supervision and policies and procedures development related to child protection."  *Id.*

From 1999 to 2011, she served as the executive director of the ACA, Texoma, where she was "responsible for delivering ACA services and programs in Texas and Oklahoma."  She states that she "delivered training to camp directors and staff on appropriate staff hiring practices [for] the purpose of child protection," she has "presented at local and regional conference[s] on the topic of staff hiring," "provided child protection training for staff employed at camps;" has "written curriculum for camp programs to implement child protection training," which "was approved by the State of Texas to meet the child protection training requirement for licensed camps in the state of Texas." *Id.*  Shaw is sufficiently qualified by her experience to testify regarding staff hiring practices for children's camps.  The Court rejects Camp America's arguments concerning reliability for the same reasons stated above with regard to Peterson.

<u>2. whether Shaw's testimony that Camp America failed to comply with its own published policies is helpful to the jury</u>

Camp America argues that Shaw's testimony that Camp America failed to comply with its own policies is not helpful because the jury is capable of applying Camp America's policies to the facts in evidence to determine whether Camp America complied with them.  As it did with Peterson, the Court agrees that the jury is capable of reading Camp America's policies and determining from

the evidence whether Camp America complied with them, and that this testimony would not assist the jury.  Thus, Shaw will not be permitted to testify that Camp America failed to follow its own policies simply for the sake of offering that testimony.  However, the Court will consider at trial whether Shaw may testify to this issue if it is relevant and necessary to her other testimony.

### 3. whether Shaw's testimony regarding the alleged duties Camp America owed contains improper legal conclusions

Camp America contends that Shaw's opinion that "Camp America established through its policies and training practices that it had a duty to implement child protection strategies" because this is an impermissible legal conclusion.  Camp America asserts that "[a]n expert may testify to facts that, if found, would permit the trier of fact to conclude that the legal standard has been satisfied, but he may not opine that the standard has been satisfied."  Docket no. 97 at 8.

Rule 704(a) provides, "An opinion is not objectionable just because it embraces an ultimate issue."  FED. R. EVID. 704(a).  This rule, however, generally does not allow witnesses to render conclusions of law.  *Smogor v. Enke*, 874 F.2d 295, 296 (5th Cir. 1989) (citing *Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983)).  In this regard, opinions that merely tell the trier of fact what result to reach or state a legal conclusion in a way that says nothing about the facts are objectionable.  Wright & Miller, FED. PRAC. & PROC. § 6284.  This is because such opinions are not "helpful" as required by Rule 701 and do not "assist" as required by Rule 702.  *Id.*  The admissibility of opinion testimony that may involve legal conclusions ultimately rests upon whether that testimony helps the jury resolve the fact issues in the case.  *Id.*  Further, "an expert's opinion may often be rendered admissible or inadmissible by a mere change in phrasing."  *Coleman v. Miller Enters.*, Civ. A. No. 2:10-CV-296, 2011 WL 7274868, at *1 (S.D. Miss. Oct. 11, 2011).

It does not appear that Shaw's testimony is designed to tell the jury what duties Camp America owed to Plaintiff or other campers as simply a legal conclusion.  Rather, her testimony indicates that Camp America recognized a need for child protection strategies and accepted some responsibility to this end, and she may testify to such facts.  To the extent Shaw might testify to legal issues designed to instruct the jury how to return a verdict, she may not do so.  However, the Court will have to evaluate the testimony at trial in response to specific questions to determine whether it is appropriate.

> 4. whether Shaw's testimony that Camp America failed to comply with industry standards is unreliable

Shaw opines that Camp America failed to follow "industry standards and accepted practices for child protection strategies related to staff hiring." Camp America states that Shaw's opinion relating to industry standards and McNaughton's interview with Zirus improperly rely on ACA guidelines, which apply to youth camps, which Camp America is not.  Camp America contends that Shaw does not explain why she concluded that ACA guidelines apply to Camp America. Notwithstanding its position that the ACA guidelines do not apply to it, Camp America contends that it did comply with them, and Shaw does not cite a single ACA guideline that Camp America failed to follow.

Shaw does not expressly state that the ACA guidelines supply the applicable standard of care for Camp America.  Rather, she states that "[i]t is the responsibility of any person or organization that provides staff for youth programs to take all reasonable steps to protect children" and that "[t]here are industry standards and accepted practices for child protection strategies related to staff hiring."  She further states that Camp America recognized the need to implement child protection

strategies and "the importance of staff screening for child protection is well documented in the Camp American policy manual, the *Interviewers Handbook*." Shaw states that, over the years, she has "advocated that staffing youth programs involves a comprehensive, multiple-layered system" and that "[a]s is recognized by the youth camp industry and youth development professionals, staff recruitment and screening practices are the first opportunity to weed out potential abusers." Although Shaw states that she reviewed the ACA Accreditation Standards, she does not expressly state in her report that the ACA guidelines establish the standard of care for Camp America, and Camp America directs the Court to no such deposition testimony. Shaw does not rely solely on the ACA standards and an article to support her opinions, as Camp America claims, but on her experience and knowledge of staffing in the youth camp industry. In addition, as noted above, Camp America's own expert cites the ACA to establish the standard of care in the industry.

Camp America further contends that Shaw's opinion regarding McNaughton's interview and notation that Zirus's experiences would make "one hell of a camp fire story" is conclusory. Shaw states that she would "expect to see a systemized interview question form completed by the interviewer indicating additional detail that supports this statement as well as appropriate follow-up questions." However, Camp America asserts, McNaughton's report states the reasons for recommending Zirus and Shaw does not explain why they are insufficient. Therefore, Camp America argues, Shaw fails to explain her assertions that the interview was insufficient and she provides insufficient rationale for her conclusions.

The Court agrees with Camp America that Shaw's report would benefit from greater detail and explanation, but it is not so lacking as to be inadmissible. The interview report Shaw refers to states that Zirus's "lifestory will make for one hell of a campfire story!" By referencing the

24

interview report, she indicates that aspects of Zirus's "lifestory" raised red flags that warranted followup, and she states that industry accepted practices would involve a "systemized interview question form" with detail and follow-up questions.  The details supporting the bases of Shaw's conclusions can be explored through cross-examination and go to the weight rather than the admissibility of this testimony.

## C. David T. Dunagan

David Dunagan's report (docket no. 98, Ex. C) states that he is an expert in information technology and internet technologies and that he has 27 years of direct experience in information technology.  He states that he is familiar with internet search engines and content analysis because of his work assisting customers with website and content search optimization.  His opinion is that a search of Zirus's name in 2008 would have produced a particular result – http://shadoranmovement.blogspot.com – and this "would have appeared, if not on the first page of results, on the first few pages."[2]  Dunagan states that "[t]he search engine reference date of this link is August 20, 2008," which "indicates that this particular blog would have existed if searched from between August 20, 2008 and August 30, 2008 up to the present time."  He states, "This reference date is generated by the search engine and not by an individual."  Additionally, he notes, "the actual blog entry itself - which is generated by the blog website software – references the same date and also includes the time '4:13 am'."  From these two date stamps and how they are generated and preserved, Dunagan concludes "that this content was available as early as late August 2008 from a simple search engine query of Mr. Zirus's name."

Dunagan also produced a supplemental report, in which he states that a search between

---

[2]  This webpage is a blog entry called "Dair Shoron - the intriduction [*sic*] to Shadoran."

August and December 2008 would have revealed the Shadoran blog entry "at or near the top" of the results.  Dunagan further states that the Google and Blogspot time entries are reliable.

In his deposition, Dunagan explained his methodology using Google: "So what I did in my search result is I said okay, if I look up the name there are all these results.  I'm now going to take that and say I only want to see what Google said it found and thus presented to users in a narrowed date range, which I narrowed it down to August 20th through August 30th."  Dunagan depo. at 21.  Dunagan states that he searched "Scott Zirus" on Google, then clicked on "search tools" and created a custom date range.  The search results were then a single page and the blog page was the first link.  Dunagan also agreed, however, that the content of the webpage could have been changed, and there is no way to know whether the content of the page was the same in 2008.

Camp America moves to exclude Dunagan's testimony as unreliable.  It asserts that Google's customized search only uncovers results that were published to the web within the specified dates, and does not demonstrate the search results that would have been returned if a user was actually searching Google on those dates.  But Camp America notes that Dunagan testified in his deposition that his method came up with exactly what a user would have seen in 2008 and that "if you searched in that date range [the Shadoran blog post] is what you're going to find ... it's the very top link."  Camp America asserts that Dunagan unjustifiably extrapolated from an accepted premise to an unfounded conclusion, and his testimony should be excluded.  Camp America contends that Dunagan's testimony "demonstrates a vast 'analytical gap' between his actual results (which purport to show the date the document was published) and his conclusion that a user searched for 'Scott Zirus' in 2008 would have uncovered the Shadoran blog posting 'if not on the first page of results, on the first few pages.'"  Camp America argues that there is no evidence regarding what an actual

user searching for Zirus' name would have uncovered in 2008.  It further contends that there has been no showing that using this customized Google search is reliable in the function it sets out to perform - identifying the date a document was posted on the internet.  Camp America states that there has been no showing that the Google custom search tool has an acceptable rate of error or whether professionals in the fields of computer forensics and data recovery generally accept its results within their scientific community.

Camp America further contends that the testimony is not helpful to the jury because Dunagan cannot say that the content of the webpage was the same in 2008 and his testimony "does not help establish whether a search of Scott Zirus performed during that time frame would have uncovered the blog post, or whether a reasonable viewer could have linked the blog post to Scott Zirus during that time."  Last, Camp America argues that Dunagan is not qualified to offer opinions regarding computer forensics and data recovery because he does not have more education, training, knowledge, or expertise than an average juror.

Plaintiffs respond that Dunagan's resume and report reflect that he has specialized knowledge in the computer industry, that he relied upon published and accepted materials in that industry in reaching his conclusions, and that he presents the Court with the actual results of his testing, demonstrating the support for his conclusions.  Plaintiffs assert that Dunagan's testimony "is further buttressed by his reference and inclusion of actual patents and computer materials that support his conclusions."

The Court disagrees with Camp America that Dunagan would be required to have experience in computer forensics and data recovery to opine on these matters.  He has shown that he has experience working with internet search engines and content analysis because of his work assisting

27

customers with website and content search optimization. In that regard, he testified that his company works "with search engines understanding them as to why they're making things show up where they do." Depo. at 17. A lack of specialization should generally go to the weight of the evidence rather than its admissibility and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Wen Chyu Liu*, 716 F.3f 159, 168-69 (5th Cir. 2013) (citing *Daubert*, 509 U.S. at 596). Thus "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.*

It is unclear whether Camp America is asserting that Dunagan testified that the Shadoran blog post would have been the top result in the Google search in 2008. If so, the Court does not construe the testimony that way. Dunagan's opinion is that, had the search been conducted in 2008, the Shadoran blog entry would have been "at or near the top." He bases that opinion on the fact that the search engine reference date for the Shadoran blog entry is August 20, 2008, which indicates that the blog entry would have existed on the web if searched between August 20 or 30, 2008 and the present; the blog entry itself references the same date; and when running the search today with the specified date range, the Shadoran blog post comes up, and is the first result. While it does appear that Dunagan admits that he cannot say exactly what results would have been returned to a user searching "Scott Zirus" in 2008, his testimony is admissible regarding whether the blog entry would have been likely to be returned among the results, and where in those results it would likely have been. Dunagan's testimony is also helpful to the jury on these issues. Camp America's arguments go to the weight rather than the admissibility of his testimony.

**Conclusion**

Camp America's motion to exclude the testimony of Michael J. Peterson (docket no. 99) is GRANTED IN PART AND DENIED IN PART as discussed herein.

Camp America's motion to exclude the testimony of Danielle Shaw (docket no. 97) is DENIED.

Camp America's motion to exclude the testimony of David T. Dunagan (docket no. 98) is DENIED.

It is so ORDERED.

SIGNED this 24th day of September, 2013.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE